## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THOMAS J. PERNICE** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MODENA HOLDING CORP.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **ERIC BOVIM,** | ) | |
| | ) | |
| **STEVEN MCBEE,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **MCBEE STRATEGIC CONSULTING, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

Plaintiffs Thomas J. Pernice and Modena Holding Corp. (collectively, the "Plaintiffs"), by counsel, for their Complaint against Defendants Eric Bovim, Steven McBee, and McBee Strategic Consulting, Inc. (collectively, the "Defendants"), allege as follows:

### INTRODUCTION

1.      This is a Complaint seeking monetary relief arising from the fraudulently induced transfer of the assets of Plaintiff Pernice's former company, Gibraltar Associates, LLC, the breach of an independent contractor agreement between Plaintiff Modena Holding Corp. and Defendant McBee Strategic Consulting, LLC, and related claims. Defendants Bovim and McBee conspired to fraudulently induce Plaintiff Pernice to sell the assets and goodwill of his successful

1

former company and then wrongfully terminated him from the successor entity.

## PARTIES

2.      Plaintiff Thomas J. Pernice is a resident of Los Angeles, California. Mr. Pernice is the former co-owner, along with Defendant Bovim, of Gibraltar Associates, LLC. The assets and goodwill of Gibraltar Associates were acquired by Defendant McBee Strategic Consulting.

3.      Plaintiff Modena Holding Corp. ("Modena") is a California S- Corporation with its principal place of business at 23823 Malibu Road #304 in Los Angeles, California. Modena was a consultant to Defendant McBee Strategic Consulting in accordance with an Independent Contractor Services Agreement.

4.      Defendant Eric Bovim is a resident of Washington, DC. Mr. Bovim is a co-owner, along with Defendant Steven McBee, of Defendant McBee Strategic Consulting.

5.      On information and belief, Defendant Steven McBee is a resident of Washington, DC. Mr. McBee is a co-owner, along with Defendant Bovim, of Defendant McBee Strategic Consulting.

6.      Defendant McBee Strategic Consulting, LLC ("McBee Strategic") is a Delaware LLC with its principal place of business in Washington, DC.

## JURISDICTION AND VENUE

7.      The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S. Code § 1332.

8.      This Court has personal jurisdiction over the Defendants herein pursuant to D.C. Code § 13-422 and 423(a).

2

## FACTS COMMON TO ALL COUNTS

Start Up History

9.      Plaintiff Pernice was Co-Manager of Gibraltar Associates. Mr. Pernice is an experienced entrepreneur who had extensive business contacts and an outstanding reputation in his business ventures both in Los Angeles and Washington, DC.

10.     Prior to an introduction to Defendant Bovim, Mr. Pernice was also the President and CEO of Modena. Pernice maintained an impressive contact database from over 30 years of high level positions, including working in two White Houses and for the Secretary of Energy. Pernice is highly respected in the business community; he is an affable, well liked person with lots of friends; requests for appointments are easily granted to him.

11.     Modena is a successful public relations/affairs and communications company that referred business to DCI Group, a public affairs company based in Washington, DC. Mr. Pernice had a referral arrangement with DCI and sent several successful assignments to the firm, including Dole Food Company, Inc and KKR in New York, among others.

12.     Defendant Bovim was previously the Co-Manager of Gibraltar Associates, LLC and currently, is Managing Director of McBee Strategic.

13.     In or about late 2005, Pernice was introduced to defendant Eric Bovim, who was a junior VP in his late 20s at that time, by the DCI president, in order to have Bovim help do the leg work on the accounts. Pernice subsequently learned from Bovim that Bovim was unhappy with his compensation relative to the book of business Bovim believed he managed for DCI.

14.     In or about late 2006 or early 2007, Bovim recognized Pernice was a prolific referral source. Bovim approached Pernice for advice on Bovim's career. Bovim stated he was

3

thinking of leaving DCI and would like counsel and introductions from Pernice, which Pernice agreed to do.

15.     Subsequently, Bovim asked Pernice if Pernice would be interested in being a partner with Bovim to help start and finance a firm; Pernice offered to help finance the start up of the new company, Gibraltar, through Pernice's existing business, Modena. Although Bovim stated he was unable to go without pay himself, Pernice offered to go without pay until Gibraltar generated new clients/income, recommending not creating a "cash burn" until Pernice and Bovim knew they had revenues from new business from Gibraltar.

16.     After a six month period of forming the new Limited Liability Company, drafting a business plan together, and finalizing an operating agreement, Pernice and Bovim had the necessary elements in place to formally launch Gibraltar. Pernice lent his executive experience and existing book of business to establish credibility for the new company.

17.     During this six month formation period, Pernice was able to secure Dole as a client due to Pernice's long standing, ongoing, close relationship with key Dole executives and history of excellent work for Dole, which gave Pernice and Bovim the additional seed capital needed for the formation and startup of Gibraltar.

18.     Bovim shared news about Gibraltar and Pernice's involvement with Gilead Sciences, a major client. After meeting with Pernice, the Gilead Senior VP and General Counsel realized Gibraltar was a real and credible venture, and Gilead offered to move the account to Gibraltar. This was a major win for Gibraltar, which along with Dole enabled Gibraltar to quickly make some key hires and begin paying both Pernice and Bovim.

Early Issues with Bovim

19.     In or about 2008, a core part of the Gibraltar business strategy was to focus on building a Washington, DC office presence with Eric Bovim as CEO; the DC office was co-managed by Pernice and Bovim, and the Los Angeles office was managed and controlled by Pernice, as Chairman. The office space in Washington, DC was upgraded and business professionals were added as support for Bovim in the Washington, DC office.

20.     Monthly telephonic staff meetings were conducted between LA and DC; Pernice traveled to DC for one week each month. Pernice also traveled to New York regularly during the DC trip to develop new business relationships and clients. Bovim and Pernice spoke on a daily basis. Gibraltar was known as an excellent place to work where everyone's ideas were welcome and respected and management had an open door policy.

21.     Around the beginning of 2008, once Gibraltar was up and running and showing profits, Bovim attempted to terminate the relationship between Pernice and Bovim and take "his" business (mostly derived from Pernice) with him. Bovim made inaccurate accusations about the respective time spent on building the business by Pernice and Bovim because Pernice was in Los Angeles and Bovim in Washington, DC. However, Pernice ultimately convinced Bovim that he could not unilaterally seize control of the DC office and make it into his own separate company.

22.     Pernice then flew to Washington, DC and ironed out the differences with Bovim and Pernice, and Bovim agreed to add more weekly conversations, to have Pernice spend a week a month in Washington, DC, and to reinforce the business plan to grow the company together as Pernice and Bovim had originally agreed to do.

23.     Pernice and Bovim got past this initial conflict, and continued to win clients and build out Gibraltar.

24.     In August 2008, Pernice's connections led to the hiring of a President for Gibraltar, who was wrestled away from Burson Marsteller, where he was the national practice chairman of one of the nation's leading PR firms. In Jim Lake who was an exceptional employee, Gibraltar was able to hire a first class President for the company, which Bovim needed as Bovim was ill-equipped to manage a firm, personnel, finance and other requisite administrative needs. Bovim was excellent at client work, creative ideas and tactics to service accounts which was his core value, but lacked leadership and personnel skills. Lake subsequently initiated telephonic, bi-coastal, weekly staff meetings; and, twice monthly bi-coastal, telephonic new business meetings among many other leadership initiatives.

25.     Around that same time, Gibraltar also terminated the accounting firm Bovim had initially recommended and brought in a major accounting firm, Holthouse Carlin & Van Trigt, which Pernice had a prior relationship with. As Gibraltar moved along and needed more world class professionals, Pernice's network was utilized to build the company. The outside Board of Advisors were all drawn from Pernice's prior relationships. Pernice also created a comprehensive tracking grid so that new leads from Pernice and other managers would be pursued and followed through until the lead became a client.

Bovim Management Failures

26.     In or about 2009-2011, Gibraltar continued to grow 25-35% per year in spite of the economic downturn. During this time, Gibraltar expanded its credit facility and upgraded offices and personnel. In late 2011, Gibraltar hired a leading business coach, Deb Robins, to

6

work with Bovim and Pernice on resolving business issues/conflicts between them and to develop the culture of Gibraltar and its mission statement. Ultimately, this business coach worked with the entire firm, handling off-site HR development and one on one calls with the leadership and staff.  Robins worked primarily from the LA office, traveling to DC several times to integrate with the DC staff, effectively work on client business, and to help with marketing Gibraltar.

27.    Bovim continued to push for more transparency with the staff, vesting top people with the title of "partners," and pushing Pernice to form an equity/profit sharing plan, which he ultimately created with outside counsel, Erwin Cohen & Jessup, another of Pernice's contacts. In 2008, Bovim insisted that Gibraltar adopt a 401(k) plan, believing that it would attract better professionals to the company, but this was implemented before the relatively young company was ready to do so, and created problems for the company. Similarly, allowing for "partners" to be added to the active management team was a huge failure, later realized by Bovim, which created more acrimony and management problems for Gibraltar.

28.    During this time, Pernice was constantly repairing the damage resulting from Bovim's poor management decisions. Most of Pernice's DC trips were focused on mending fences and repairing relationships with the staff that were harmed by Bovim, primarily due to Bovim's inability to manage the staff or leadership. During this time, Bovim was flippant, moody, flamboyant, and grew more eccentric, as the company succeeded and Bovim made larger salary draws. The President, Lake, was often dismayed with this behavior and provided the necessary day to day adult leadership that was needed but lacking in Bovim.

29.     During this time, there were many ongoing disagreements between Pernice and Bovim over spending on personnel and office overhead for DC. While Pernice worked to manage cash flow, Bovim would agree to and announce spending without consulting Pernice. Pernice would later learn of the expenditures and would have to work to find the money or cut in another places to make things work.

30.     During this time, the business coach, Deb Robins, was instrumental in helping Pernice resolve many of these issues and come to consensus with Bovim and the other "partners." Despite these attributes, Bovim, on several occasions, pushed to terminate Robins.

Bovim Melt Down

31.     In or about late 2011, Bovim "melted down" and told Pernice that he, Bovim, could not handle the stress of running the office and the work load. Bovim was in over his head and had other stress issues that Bovim would later reveal.

32.     In light of this, Gibraltar needed to make another high level hire to help Bovim with Gilead and the expanding work load.

33.     Gibraltar hired Kelley McCormick from Corvis Communications to be a "partner" level employee. Bovim insisted on giving McCormick a COO title to offset Lake, the President, who Bovim wanted to unjustifiably terminate or dilute his authority.

34.     Bovim seemed threatened by the President, Lake, who was a solid, honest, ethical, and even-handed leader who the staff looked up to. However, Bovim resented Lake because he was also a confidant for Pernice who helped him watch over the office. Therefore, Bovim coddled McCormick and convinced Pernice to overspend on McCormick's salary and bonus structure. While she was a very skilled PR professional, McCormick never came close to

8

meeting Gibraltar's expectations for her role and was divisive to Pernice's partnership with Bovim.

35.     McCormick and her support team later dropped the ball on one of Gibraltar's best brand name clients, Dole, missing the deadline for some work product.

36.     On information and belief, Gibraltar's relationship with Dole was deliberately compromised by McCormick at Bovim's direction in hopes that Gibraltar would lose the account and the loss could be blamed on Pernice (which it later was, by McBee and Bovim).

Introduction to McBee Strategic

37.     In or about 2012, Gibraltar celebrated its five-year anniversary and several milestones: Gibraltar was named as one of Inc. Magazine's 500 fastest growing companies in America, one of PR Week's Top 60 independent PR firms in America, and more.

38.     In or about August 2012, Bovim met Steven McBee in New York City. Bovim was introduced to McBee by one of Gibraltar's Vice Presidents, Jackie Kahn, whose boyfriend worked for McBee Strategic.

39.     In or about July to August 2012, Bovim announced to Pernice that he, Bovim, has Clinical Depression ("CD") and also Attention Deficit Disorder ("ADD"). On information and belief, he actually had Attention Deficit Hyperactivity Disorder ("ADHD"), all of which explained much of Bovim's past erratic behavior. Pernice discussed these conditions with Bovim offered to support Bovim in any way possible and took on more company burden to help and to relieve pressure on Bovim.

40.     Around this same time, Bovim unilaterally developed a relationship with McBee. Pernice warned Bovim about failing to include him, Pernice, in discussions and meetings,

particularly substantive business development conversations in furtherance of forging a business relationship with McBee.

41.     In or about September through November 2011, several meetings were held between Pernice, Bovim, and other Gibraltar personnel, and McBee and other McBee Strategic personnel regarding potential synergies, cost efficiencies, business growth opportunities, and possible structures of a business relationship between Gibraltar and McBee Strategic. Several forms of the joint relationship were considered: from a joint venture, to an acquisition as a subsidiary, to a full merger.

The Letter of Intent

42.     In or about October, 2011, at McBee and Bovim's urging, it was agreed between McBee, Bovim and Pernice would use a "friend of the deal" investment/legal advisor to save on costs and time as opposed to hiring legal counsel on both sides. Bovim, Pernice and McBee got recommendations for five law firms, narrowed down to three via interviews; Venable LLP, which is a large firm in DC, was chosen to be a mediator/third party to help Pernice, Bovim and McBee pen a Letter of Intent ("LOI") outlining the top deal points/framework for a merger. For financial and business development reasons (and due to the approaching Presidential election), the parties sought to consummate the deal before the end of the year.

43.     Pernice, Bovim and McBee (and Venable counsel) had four to five meetings in DC where the core deal terms were discussed. The primary sticking points were related to the equity each party would receive because there was no existing equity sharing or compensation plan at McBee Strategic, although McBee said they had been working on one for some time and were getting close. McBee stated that Bovim and Pernice would be "at the top of the list" for the

10

"equity plan" when McBee Strategic completed that equity plan in mid to late 2013. However, McBee initially did not want this promise included in the LOI.

44.     Bovim pressured Pernice on the issue of an equity program. Bovim stated that he did not care about an equity program defining what each party would receive because of the chance to double their compensation under the bigger company (McBee Strategic and Gibraltar combined) in the short term. Bovim pressured Pernice to accept McBee's proposal for an equity plan that would be developed later in the year.

45.     Despite this compromise, without additional clarification or written commitment to an equity program in the LOI, Pernice was ready to walk from the deal.

46.     With respect to the equity program, McBee stated that he felt it was not necessary because "he had no intention of ever selling his company," adding, "This company is for my children and is part of my legacy." This statement was later revealed to have been false, as McBee sold the company in late 2014.

47.     Ultimately, McBee agreed to add the equity each party would receive to the LOI , but the wording of these provisions was unclear and ambiguous.

48.     Although Pernice was wary of moving forward with a joint business arrangement between Gibraltar and McBee Strategic in light of the questionable commitment to an equity plan, Pernice believed McBee's false statements that he would never sell the company and, in reliance on those statements, agreed to continue discussions and consider the overall agreement on salary and the length of guaranteed payments. With respect to the latter, Pernice and Bovim initially wanted 24 months of guaranteed payments, but they settled on 18 months in exchange

for the promise of equity in the company once McBee Strategic developed its equity

compensation plan.

The Asset Purchase Agreement

49.     The Letter Of Intent that Venable LLP (Friend of the Deal) drafted, was turned

over to the law firm Arnold & Porter to draft the Asset Purchase Agreement ("APA"). Steven

McBee along with his wife, Jennifer Noland, Esq., in house counsel for McBee Strategic, drafted

the first draft with Steven McBee/McBee Strategic's outside counsel, Nixon Peabody.

50.     The LOI included certain terms that were important to Pernice. Indeed, but for

these terms, Pernice would not have moved forward with any deal with McBee Strategic. These

included the following:

a.     A real commitment to preserving and building a combined corporate culture.

McBee knew that Pernice believed that paying attention to employee's needs was paramount to

building a successful company and sought to preserve this within the culture of the new

company.

b.     Pernice would provide his services to the company as an independent

contractor.

c.     Pernice would received guaranteed payments for his services for a period of

18 months.

d.     Pernice would be entitled to an equity interest in the combined company

within six to nine months.

e.     Pernice would have a leadership role in the combined company.

      f.    The combined company would establish an equity fund for investing in deals that would include the formation or purchase of a broker dealer, and Pernice would have a leadership role in this initiative.

      g.    The deal would include an exit clause such that, if things did not work out for some reason, Pernice and/or Bovim could take their clients back and re-form Gibraltar.

      h.    Continued marketing of the Gibraltar brand, with a change of the McBee Strategic website and other marketing materials to include the Gibraltar name in the company name, i.e., McBee Strategic-Gibraltar.

      i.    Gibraltar and McBee Strategic keep separate Profit and Loss statements for 18 months, to track each company's performance and also to maintain the ability for Gibraltar and Pernice to pull out of the deal if it did not work out.

      j.    The promise of preserving the strong corporate culture that Gibraltar engendered and retaining all of the Gibraltar employee's and their compensation structures.  This also included consideration for a new position that President Lake would manage new multiple McBee offices which were discussed to be opened with the combined firm and McCormick to be considered for a new position of Chief Marketing Officer.

      51.    Pernice flew to Washington DC on November 26, 2011 with the above core points and was ready to end the deal if the core points were not agreed to by McBee. At the meeting at the Jefferson Hotel, which included Bovim, McBee (somewhat to Pernice's surprise) stated that he agreed to all points.

      52.    On information and belief, when they said they agreed to the above core points, McBee and Bovim never intended to honor many or most of them.

53.     Indeed, shortly thereafter, these fundamental points of the LOI were breached and/or surreptitiously removed from the APA or diluted in the APA:

a.   Pernice was excluded from leadership meetings with the core partners, McBee and Bovim.

b.   Pernice did not receive guaranteed payments for 18 months as promised; in fact, Pernice received only 6 months of payments and then was improperly terminated.

c.   Pernice's improper termination after approximately 6 months,  prevented any opportunity for Pernice to "unwind" the joined companies; prevented any opportunity for Pernice to realize promised year end profits.

d.   Once the LOI was in place in December, McBee and Bovim made themselves unavailable to Pernice: they avoided Pernice when Pernice came to Washington DC for the combined company's holiday party; and again the following January during a planned trip to San Francisco with McBee to meet business clients and discuss growth strategy and plans for the equity fund and broker dealer. McBee also excluded Pernice from a previously planned trip to London in which Pernice was supposed to accompany McBee for business development and introducing McBee to Pernice's clients and relationships.

e.   McBee also avoided another meeting intended to map out more of the details planning the equity fund and broker dealer project.

f.   The combined company did not continue to market Gibraltar and did not update the McBee Strategic website landing page to include the Gibraltar name, but instead placed it in subsequent pages.

g.   No efforts were made in furtherance of the commitment to preserve and build a combined culture between the two companies. In fact, Deb Robins, the business consultant who was purportedly hired to facilitate the development of a combined culture, was terminated shortly after the Asset Purchase Agreement was signed.

h.   Bovim and McBee never kept separate Profit and Loss statements but immediately combined them.

54.   Specifically, during the negotiation of the APA, numerous changes were made to the basic deal points, many without Pernice's knowledge or consent, including:

a.   Provisions were added to the APA to allow the company to terminate Pernice "for cause" by McBee and his wife Jennifer Noland, Esq., without Pernice's knowledge or consent. On information and belief, this was done in furtherance and anticipation of a plan formed at the inception of the new combined company to terminate Pernice and deprive him of the agreed-upon guaranteed compensation payments for at least 18 months.

b.   Following Pernice's objection to the "termination for cause" provision in the APA, the provision was removed from the APA. However, the same provision was later inserted into Modena's independent contractor agreement, in a deceptive and misleading manner that led Pernice to believe that he could only be terminated "for cause" if he did no work whatsoever and just "sat on the beach for 18 months," according to George Covucci of Arnold & Porter, who was acting on behalf of Steven McBee/McBee Strategic.

c.   During this time, despite being a manager of Gibraltar, Bovim was negotiating directly with McBee (rather than through counsel for Gibraltar) in furtherance of his own agenda, and contrary to the interests of Gibraltar and Pernice.

15

The APA: Financial Issues

55.     In or about October, 2012, when the parties were discussing the LOI, full due diligence was performed and full disclosure was made to McBee/McBee Strategic; however, in or about December 2012, McBee/McBee Strategic complained that when the Gibraltar numbers were analyzed, they were less than what McBee expected.

56.     The parties agreed and understood that, under the APA, Bovim and Pernice would end up with a small shortfall in the Accounts Receivable/Accounts Payable, with a possible personal exposure for Pernice and Bovim of up to $100k each, which McBee Strategic would not pay under the APA.

57.     Under the APA, Gibraltar turned over approximately $5M in assets (consisting primarily of the book of business substantially developed by Pernice and the Gibraltar team, as more specifically itemized in the APA) to the combined company, McBee Strategic-Gibraltar. In consideration, Gibraltar received a "nominal" purchase price of $100,000, and Pernice was made an independent contractor consultant to the combined company, with 18 months of guaranteed income and other compensation. Under the APA, Gibraltar left with a substantial portion of the existing debt (to be serviced, at least in part, by existing receivables).

58.     While discussing the APA, the parties understood and agreed that, sometime in 2013, McBee Strategic was to implement an equity, profit sharing or similar component for Pernice/Modena, as referenced in the LOI/Proposed Transaction between the parties. However, this agreed-upon essential term was later changed under the Independent Contractor Agreement to a mere hypothetical: "If McBee Strategic implements an equity incentive program...".

16

59.     As the January 1, 2013 APA closing date approached, Bovim actively, aggressively, and adamantly pushed Pernice to agree and accept the terms of the APA as proposed by McBee/McBee Strategic. On information and belief, Bovim and McBee conspired to close the APA and cut Pernice out of the future combined company through the following actions:

a.      Bovim and McBee had several secret meetings, in person and by email and telephone, to which Pernice was not privy or informed.

b.      Bovim threatened to Pernice to quit, "go his own way", "blow up the company" and leave Gibraltar; leaving Pernice with all of the work and clients to service, as well as the business and administrative chaos created at this point, due to the time and travel necessary to accomplish and comply with the projected closing date for the combined company. Pernice, knowing of Bovim's mental health issues, had good reason to believe that Bovim could no longer handle the work load of Gibraltar and could and would act in a manner to destroy the business of Gibraltar that Pernice and the team had built.

c.      On information and belief, Bovim, although in a fiduciary relationship with Pernice and Gibraltar, went behind Pernice's back and without Pernice's knowledge or approval, made side agreements related to all of McBee's/McBee Strategic's demands and terms related to the APA.

d.      Bovim surreptitiously usurped power and control over existing Gibraltar clients by cutting Pernice out of communication and contact with them and was further aided by McBee and McBee Chief of Staff Jennifer Rihani in systematically cutting Pernice out of daily

operations and thereby preventing and making performance on the Independent Contractor
agreement impossible for Pernice/Modena.

60.     As further evidence of Bovim's conspiracy with McBee and McBee strategic to
terminate Pernice, on or about May 28, 2013 (one week before Pernice/Modena's termination),
Bovim, without Pernice's consent or the notice required by Gibraltar's operating agreement,
fraudulently made an unauthorized "counter withdrawal" from Gibraltar's Bank of America
accounts in Washington, DC thereby stealing the remaining corporate funds which were intended
for the employee 401K Safe Harbor payment required by law, among other expenses. Pernice
only learned of the theft when he went to secure the accounts upon learning of his/ Modena's
termination by McBee Strategic on June 5, 2013.

61.     In addition, after the APA was signed, McBee continued to use the Gibraltar
name in violation of the terms of the APA, which states that the name could only be used as long
as Pernice was employed by McBee.

The Independent Contractor Agreement

62.     On or about December 2012-January 1, 2013, the time of the signing of the APA,
Pernice, through Modena, entered into an Independent Contractor Service Agreement with
McBee Strategic Consulting, LLC.

63.     In accordance with the LOI between McBee Strategic and Gibraltar, Pernice was
to be a key player and to have a leadership role in the combined company including, but not
limited to the following:

        a.      Pernice was to be routinely copied on company correspondence and kept
abreast of company meetings by senior management to attend via conference call or in person.

18

       b.     McBee would take meetings with Pernice and consider his ideas.

       c.     Pernice would serve as a consultant to the leadership team, have access to and collaborate with McBee in determining the strategic vision of McBee's overall business, including the combined company.

64.     Under the Independent Contractor agreement, Pernice, through Modena, was to perform certain services as more specifically set forth in the Scope of Work, including but not limited to the following:

       a.     Pernice would be a Senior Counselor and will co-lead on the management and execution of the Gibraltar transition to McBee Strategic and establishment of the combined company.

       b.     Pernice would attend and provide advice at company leadership meetings, business development meetings, and other official leadership functions.

       c.     Pernice would be routinely copied on company correspondence, particularly related to the combined company.

       d.     Pernice would be kept abreast of company meetings by senior management to attend via conference call or in person.

65.     Despite these terms, on information and belief, neither Bovim, McBee, or McBee Strategic intended to act in good faith and to comply with the terms and conditions of the LOI, APA, the Independent Contractor agreement, including the following:

       a.     Pernice was systematically cut out of communications, meetings, contact with McBee or other senior leadership of McBee Strategic.

       b.     Pernice was not given access to meeting times with McBee; and instead, was told McBee was not available.

       c.     Pernice was not informed of meetings, was eliminated from access to company email, and was not copied on emails or any other correspondence related to Gibraltar or the combined company.

       d.     Pernice was not given access to the leadership team to discuss and determine, inter alia, strategic vision for the combined company's overall business, business development growth plans, marketing, branding or the development of the equity fund.

       e.     Pernice was not given a company email address but was instructed to make up a new email address and develop his own web site, further distancing him from the company.

       f.     The McBee Strategic IT personnel were instructed not to assist Pernice in making transitions necessary to access pertinent communications, internet and email, with the combined company.

       g.     Bovim made himself unavailable to meet with Pernice or to discuss or assist with the extensive work load of the wind down of Gibraltar.

66.     Moreover, Bovim, McBee, and McBee Strategic took affirmative action to isolate Pernice from participation in the new joint company almost from day one, and make the performance of the services set forth in the Scope of Work of the Independent Contractor Agreement difficult or impossible, including:

       a.     Pernice was not given a McBee Strategic email address.

b.   McBee reversed his prior agreement to allow Pernice to have an office at the new joint company; Pernice was not allowed to have an office.

c.   McBee unilaterally changed Pernice's title, changing the associated press release and Pernice's bio on the company's website.

d.   McBee wouldn't allow any employees to use the Los Angeles offices. In January 2012, they abruptly moved one employee (Caitlin Carroll) out of the LA office to a rental office across the street, without any notice to Pernice, who was responsible for that office.

e.   Bovim/McBee would not allow or would "make" Gibraltar employee's suddenly unavailable or too busy to assist Pernice with business development pitches and meetings.

f.   McBee encouraged Pernice to abandon the lease of the Los Angeles office entirely, potentially harming the company and resulting in liability, but Pernice did not follow this advice.

g.   Pernice was not informed of meetings, was eliminated from access to company email, and was not copied on emails or any other correspondence related to Gibraltar or the combined company.

h.   Bovim made himself unavailable to meet with Pernice and informed his assistant to "stack" his schedule when Pernice would travel to Washington, D.C.

67.   Additional specific examples of the above referenced actions intended to isolate Pernice from participation in the new joint company and make the performance of the services set forth in the Scope of Work of the Independent Contractor Agreement difficult or impossible, include:

       a.     Officers of McBee Strategic repeatedly ignored spite of numerous requests for meetings and requests for access to emails by Pernice.

       b.     In or about January 2013, McBee deliberately scheduled a telephonic meeting for business development, when McBee knew Pernice would not be available, i.e., at 6:00 a.m. EST (3:00 a.m. PST for Pernice), which precluded Pernice from attending.

       c.     McBee, at the last minute, cancelled a meeting with Pernice for a trip to San Francisco to discuss or to architect how McBee and Pernice would work together, the equity fund, business development and ongoing MGA business, post merger.

       d.     McBee failed and refused to clarify how or in what form McBee intended for Pernice to communicate with McBee. In fact, when Pernice responded to proposed business deals received from McBee, McBee denied receiving Pernice's responses, chastised Pernice for not responding and then delegated Pernice to communicate with McBee Strategic personnel other than McBee himself.

       e.     Pernice was completely excluded from the process of writing the press release announcing the merger, and several notable details were changed without his consent.

       f.     McBee unilaterally cancelled a strategic meeting in London in which McBee was to be introduced to Pernice's contacts in London, instead going without Pernice.

       g.     During Pernice's scheduled monthly trips to DC (as required by the Independent contract agreement), Bovim, in information and belief, instructed his assistance to "pack his schedule" so as to be unavailable for any meeting with Pernice during the entirety of the multi-day visits.

h.    All leadership meetings of the combined company were scheduled in such a way so as to avoid Pernice's scheduled travel to DC and take place at a time when Pernice would not be available. Participation by telephone was even eliminated to further impede his ability to participate and execute on his duties as set forth in the Independent Contractor Agreement.

i.    In or about February 2013, Bovim requested that Pernice set up a meeting with a close personal friend of Pernice who owns a firm in Washington DC for a business proposal with McBee. Ultimately, Pernice was displaced by McBee, and the meeting was scheduled without Pernice.

68.    On information and belief, these restrictions were intentional acts in furtherance of a pre-existing plan to dismantle the Los Angeles office, dismantle Pernice's team of loyal staff in that office (nearly all GA staff have quit or have been terminated by McBee/Bovim including its senior leaders Lake and McCormick), and reduce the value of the Gibraltar contribution to the new joint company.

69.    On information and belief, these restrictions were intentional acts in furtherance of a pre-existing plan to alienate Pernice, to distance him from the company's operations, and to prevent and make the performance of the services set forth in the Scope of Work of the Independent Contractor Agreement difficult or impossible for Pernice, so that McBee could later invoke the "termination for cause" provision of the independent contractor agreement, depriving Pernice of his guaranteed payments and other benefits.

70.    This pre-existing plan of McBee/McBee Strategic, acting in concert with Bovim, to intentionally, deliberately, systematically, and in bad faith distance Pernice from the combined company by creating insurmountable obstacles to performance of the Independent Contractor

Agreement, which ultimately, would be used as pretext to justify McBee Strategic's termination "for cause" of the Independent Contractor agreement, resulted in McBee Strategic taking Pernice's entire client base without the agreed-upon compensation.

Pernice and Modena's Performance under the Independent Contractor Agreement

71.     At all times after the signing of the Independent Contractor Agreement, Modena performed all duties outlined in the Scope of Work fully and in a diligent and professional matter.

      a.     Specifically, Modena directly provided a multitude of meaningful pitches and strategic business leads to the combined company, resulting in several clients being signed or renewing their contracts due to these efforts.

      b.     In addition, the Scope of Work stated that Modena was to "Consult on MGA business development efforts on an ongoing basis, including but not limited to materially originating, as well as participating in or otherwise facilitating, a minimum of 2 meaningful pitches per quarter." During the six months of Pernice's contract, Modena exceeded the scope by directly originated more than 24 meaningful introductions and pitches, including Rentech, which re-upped its contract, and Clear Sign Combustion, which became a new client.

      c.     In addition, Modena made efforts to "cross sell" across all McBee Strategic business offerings, as per the Scope of Work, which included pitches on communications, lobbying, government sourced financing/grants, as well as the McBee Strategic Insights division.

72.     These efforts were in addition to the other new business brought to the combined company from Pernice and Modena's joint efforts with other members of the Gibraltar team, but which McBee Strategic refused to credit Pernice/Modena for.  During the first six months, the

combined Gibraltar team brought nine additional new client "wins" to the firm as well as expanding the scope of work and retainers of several of its existing clients including divisions of Raytheon and Gilead among others.

73. Other examples of Pernice/Modena's compliance with the Scope of Work included traveling approximately monthly to DC (which he did), assisting in the integration of Gibraltar and its clients, hiring of new personnel and interviewing of candidates, providing strategic advice and architecting "McBee 3.0," which included the Equity Fund/Broker Dealer plans among other initiatives.

Pernice/Modena's Termination

74. In or about April 29-May 1, 2013, in compliance with the Scope of Work, the LOI and mutually discussed plans for the combined company, Pernice made an Equity Fund/Broker Dealer presentation to McBee. Pernice, worked with Pernice's contacts to research a plan to establish a fund and a broker dealer. Pernice put together an extensive memo, with legal advice from attorneys that Pernice knows, with detailed tables on SEC requirements, filings, budgets, and time lines. Pernice sent the Equity Fund/Broker Dealer presentation to McBee and to Bovim before Pernice arrived, in preparation for the anticipated presentation to the management team. A meeting was then set up with McBee and Pernice, who was expecting to have more of the team at the meeting. When only McBee and his agent, Rihani, arrived, Pernice handed out copies of the Equity Fund/Broker Dealer memo which Pernice had prepared, to start the discussion. McBee then stated, "Tom, this is going to be a difficult discussion" and then told Pernice that he intends to terminate the Independent Contractor agreement.

75.     On or about June 5, 2013, in furtherance of McBee/McBee Strategic's (acting in concert with Bovim) intentional and premeditated scheme carried out through bad faith acts intended to distance Pernice/Modena from McBee and/or the combined company, and create insurmountable obstacles to performance of the Independent Contractor agreement, Jennifer Noland, Esq., general counsel for McBee Strategic delivered a termination letter to Pernice/Modena informing Pernice the Independent Contractor agreement is being terminated "for cause" effective July 6, 2013.

76.     The termination letter does not articulate the precise "cause" for the termination, despite the fact that that term is clearly defined in the Independent Contractor agreement.

77.     The termination letter states that Modena has been given prior written notice of an opportunity to cure the issues that constituted "cause" for the termination, but no such notice was ever presented to Modena or Pernice. However, when any performance related concerns were raised, Pernice increased his efforts and brought in even more leads than required under the Statement of Work.

78.     As the Independent Contractor agreement states that the compensation allowed under the agreement will survive termination except in a situation where the termination is "for cause," McBee Strategic's pretextual "for cause" termination served to deprive Pernice of the guaranteed compensation payments and other benefits he was entitled to under the Independent Contractor agreement.

## Count I: Breach of Contract (Modena v. McBee Strategic)

79.   The allegations in paragraphs 1 through 78 are re-alleged and incorporated by reference as though fully set forth herein.

80. The Independent Contractor agreement constitutes a valid and binding contract.

81. Section 4 ("Termination") of the Independent Contractor agreement states that the agreement can be terminated with or without "cause." If the termination is with*out* cause, several contractual provisions survive termination, including Section 2 ("Compensation"). Therefore, if the termination is for cause, Modena would not be entitled to additional post-termination compensation under the Independent Contractor agreement.

82. The Independent Contractor agreement defines "cause" as:

> (a) any material breach of this Agreement, provided if curable, is not cured within ten (10) days after delivery to Contractor by McBee Strategic of Notice (as defined below) or (b) Contractor's failure to perform the Services set forth in Attachment B to the Company's reasonable satisfaction at any time, provided if curable, is not cured within thirty (30) days after delivery to Contractor by McBee Strategic of Notice (as defined below).

83. McBee Strategic's July 5, 2013 Notice of Termination to Modena stated that Modena was being terminated "for Cause" "due to failure to perform the Services, as defined in the Agreement, to McBee Strategic's reasonable satisfaction, even though Modena was afforded both the cure period notice in the Agreement and additional prior notice of and opportunities to cure deficiencies." Although no such written opportunity to cure notice was sent to Modena, whenever any performance related concerns were raised, Pernice increased his efforts and brought in even more leads than required under the Statement of Work.

84. Indeed, Modena contends that all services were performed in a diligent and professional matter, and that the purported basis for the "for cause" termination was nonexistent or pretextual at best.

85. Therefore, "cause," as defined in the Independent Contractor agreement was not present and could not have been a basis for Modena's termination.

27

86.     Accordingly, McBee Strategic, which terminated Modena without cause, breached the terms of the Independent Contractor agreement by failing to compensate Modena as required under that agreement, depriving Modena of the unpaid portion of the Retainer Fees and Upside Payments due under the Independent Contractor agreement, as well as the potential additional future revenues contemplated under the Term extension provision of that agreement.

**Count II: Breach of Contract / Good Faith and Fair Dealing (Modena v. McBee Strategic) (in the Alternative)**

87.     The allegations in paragraphs 1 through 78 are re-alleged and incorporated by reference as though fully set forth herein.

88.     The Independent Contractor agreement constitutes a valid and binding contract.

89.     To the extent that it is found that cause existed to support Modena's "for cause" termination of the Independent Contractor agreement in the form of Modena's alleged "failure to perform the Services, as defined in the Agreement, to McBee Strategic's reasonable satisfaction," any such failure was caused by McBee Strategic, through McBee and Bovim, taking intentional and premeditated steps to prevent and make the performance of any such services difficult or impossible.

90.     Accordingly, McBee Strategic breached the implied covenant of good faith and fair dealing in that agreement, depriving Modena of the unpaid portion of the Retainer Fees and Upside Payments due under the Independent Contractor agreement, as well as the potential additional future revenues contemplated under the Term extension provision of that agreement.

**Count III: Fraud (Pernice and Modena v. McBee and McBee Strategic)**

91.     The allegations in paragraphs 1 through 78 are re-alleged and incorporated by reference as though fully set forth herein.

28

92.     As discussed more fully above, McBee and McBee Strategic made numerous false statements during the course of the negotiations of the LOI and the APA, including but not limited to the following:

a.     The combined company would take active steps to embrace a combined corporate culture that focused on the needs of employees.

b.     Pernice, through Modena, would receive guaranteed payments for his services for a period of a minimum of 18 months.

c.     Pernice would be entitled to an equity interest in the combined company within six to nine months.

d.     Pernice would have a leadership role in the combined company.

e.     The combined company would establish an equity fund for investing in deals that would include the formation or purchase of a broker dealer, and Pernice would have a leadership role in this initiative.

f.     The combined company would continue to market the Gibraltar brand, with a change of the McBee Strategic website and other marketing materials to include the Gibraltar name in the company name, i.e., McBee Strategic-Gibraltar.

g.     McBee never intended to sell McBee Strategic.

h.     Both Lake and McCormick were never offered nor had conversations regarding the leadership roles that were discussed during the merger negotiations; nearly every Gibraltar employee left the firm or was terminated by Bovim and McBee over the first year of operations to drastically reduce overhead, reap personal windfall gains, and make McBee Strategic's financials more attractive for the planned sale later in 2014.

29

93.     On information and belief, at the time the above false statements (and related fraudulent omissions) were uttered (or omitted) by McBee and McBee Strategic, McBee and McBee Strategic knew them to be false and had no intent at that time to follow through with any of them.

94.     These false statements were material to Pernice's agreement to the LOI and APA. Pernice would not have agreed to the sale of Gibraltar's assets—consisting of his valuable client relationships developed over many years and the recognized brand he had built—but for the representations made in these false statements, and McBee and McBee Strategic knew this at the time.

95.     These false statements were made by McBee and McBee Strategic with the intent to deceive Pernice into selling the assets of Gibraltar.

96.     Pernice reasonably relied on the representations made in the false statements in agreeing to the APA and the sale of the assets of Gibraltar.

97.     Pernice was harmed by this reliance because, as a result of the false statements, he was induced into selling the assets of Gibraltar for far less than their fair market value and also simultaneously deprived of the compensation due under the Independent Contractor agreement, as well as the potential future profits of either Gibraltar or the combined company.

**Count IV: Civil Conspiracy (Pernice v. Bovim)**

98.     The allegations in paragraphs 1 through 78 are re-alleged and incorporated by reference as though fully set forth herein.

99.     Between September and December 2011, Bovim had numerous secret meetings and communications with McBee that did not include Pernice related to the merger of the companies and Pernice's role in the combined company.

100.     On information and belief, during these meetings, Bovim and McBee/McBee Strategic reached an agreement to perpetrate the fraud on Pernice and Modena, as alleged herein.

101.     Pernice was harmed by this because, as a result of the fraudulent acts in which Bovim conspired, he was induced into selling the assets of Gibraltar for far less than their fair market value and also simultaneously deprived of the compensation due under the Independent Contractor agreement, as well as the potential future profits of either Gibraltar or the combined company.

### Count V: Unjust Enrichment (Pernice v. all Defendants)

102.     The allegations in paragraphs 1 through 78 are re-alleged and incorporated by reference as though fully set forth herein.

103.     Under the APA, Pernice sold all assets of Gibraltar—a successful going concern valued at $10-12 million that was built by Pernice—to McBee Strategic for $100,000. The other consideration contemplated by the parties was future revenues to Pernice and Modena, long term growth potential, and equity in the combined company, none of which were realized.

104.     Accordingly, McBee Strategic, and McBee and Bovim as the executives of McBee Strategic, have retained benefits that in justice and equity belong to Pernice. Under the circumstances, it is unjust and unfair for the Defendants to retain those benefits, and the Defendants have a duty to make restitution to Pernice under such circumstances.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Thomas J. Pernice and Modena Holding Corp. request that judgment be entered against Defendants Eric Bovim, Steven McBee, and McBee Strategic Consulting, Inc. as follows:

1.      An award of compensatory damages in an amount to be proven at trial, related to lost compensation owed under the Independent Contractor agreement (Retainer Fees and Upside Payments), in an amount to be proven at trial, which is believed to be at least $2,500,000.

2.      An award of compensatory damages in an amount to be proven at trial, related to lost future revenues related to projected compensation owed under the renewal terms of the Independent Contractor agreement (Retainer Fees and Upside Payments), in an amount to be proven at trial.

3.      An award of compensatory damages in an amount to be proven at trial, related to the lost value of the assets of Gibraltar, which are estimated to be at least $13,000,000, as well as lost value of that company's future growth potential.

4.      An award of punitive damages arising from the fraudulent acts alleged, in the amount of three times the actual damages awarded.

5.      An award of Plaintiff's actual costs and reasonable attorneys' fees related to this action.

**JURY DEMAND**

Pursuant to D.C. Civil Rule 38, Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: April 13, 2015

Respectfully submitted,
THOMAS J. PERNICE
AND MODENA HOLDING CORP.,
By Counsel

  /s  David Ludwig
David Ludwig, DC Bar #975891
Ellis L. Bennett, DC Bar #479059
Dunlap Bennett & Ludwig PLLC
1717 Pennsylvania Ave., Suite 1025
Washington, DC 20006
Phone: (202) 559-9040
Fax: (202) 318-0242
dludwig@dbllawyers.com